UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RAYMOND H. KIMBLE, III                        CIVIL ACTION

VERSUS                                        NO. 18-7918

LEXUS OF NEW ORLEANS ET AL.                   SECTION "S" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Raymond H. Kimble, III, is a prisoner in the Jefferson Parish Correctional Center ("JPCC") in Gretna, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 ("Section 1983"), originally in the United States District Court for the Middle District of Louisiana ("Middle District"). The original defendants were Lexus of New Orleans ("Lexus"); 19th Judicial District Office of Public Defenders; Brad Scott; Dan Schilling; Delatte, Edward & Marcantel; D. Carson Marcantel; Dickerson, LeBlanc & Woods; Victor J. Woods, Jr.; Jefferson Parish Sheriff's Office; Detective David Deroche; Doug Welborn, Clerk of Court; 24th Judicial District Public Defenders Office. Record Doc. No. 1. Plaintiff's amended complaint brought additional claims against defendants Correct Health Medical and JPCC. Record Doc. No. 8. He seeks injunctive and monetary relief. Record Doc. No. 1 (Complaint at ¶ V).

On July 18, 2018, the Middle District magistrate judge issued a report recommending that plaintiff's complaint be dismissed. Record Doc. No. 12. The district judge in the Middle District adopted the magistrate judge's report and dismissed all of

plaintiff's claims, except his claim that he received inadequate medical care at JPCC. Record Doc. No. 15.

The case was then transferred to this court on August 20, 2018. Record Doc. Nos. 16, 17. Considering the dismissal order previously issued in the Middle District, the only claim remaining for this court to address is whether plaintiff received inadequate medical care from the remaining defendants while incarcerated at JPCC during August to November 2017. Id. The sole remaining defendants in this matter are Jefferson Parish Sheriff's Office, Correct Health Medical and JPCC. Id.

On November 13, 2018, I conducted a telephone conference. Participating were plaintiff, pro se; and Kyle Kirsch, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## THE RECORD

In the November 13, 2018 hearing, plaintiff testified that he was then incarcerated at JPCC. He stated that he has criminal charges pending in Jefferson Parish for simple burglary and aggravated flight. Plaintiff testified that he also has an armed robbery charge and two burglary charges pending in East Baton Rouge Parish. Plaintiff said that he has been transferred between the Jefferson and East Baton Rouge Parish jails since April 2016. He stated that he is moved back and forth between the parishes as needed to address his pending criminal charges, but JPCC is his official housing location. Plaintiff

stated that he has not yet been convicted of any crime in either parish. Plaintiff affirmed that his one remaining claim in the instant lawsuit is that he received inadequate medical care from the remaining defendants while incarcerated in JPCC during August to November 2017.

Plaintiff testified that in late July 2017, he was involved in an altercation in East Baton Rouge Parish Prison ("EBRPP"), in which his eye was injured. Plaintiff testified that he received a black eye in the altercation. He said that after the altercation he was seen by medical staff at EBRPP. Plaintiff stated that when medical staff examined him, they observed that his eye was damaged. He testified that medical staff speculated that the interior part of his eye had been scratched during the altercation. Plaintiff said that he was told by an unnamed EBRPP nurse that he may need to see an ophthalmologist for his eye injury.

Plaintiff testified that on August 2, 2017, approximately three days after the altercation and initial examination by EBRPP medical staff, he was transferred to JPCC. Plaintiff testified that upon entry at JPCC, a screening examination was performed on him by Nurse Griselda Jones, in which his blood pressure and vitals were checked. Plaintiff stated that during the screening process, he informed JPCC medical staff that his eye was injured and that EBRPP medical staff had advised him to see an ophthalmologist. Plaintiff testified that upon entry to JPCC, he had in his possession a gel solution prescribed to him by EBRPP medical staff. He stated that this gel solution

was taken from him by JPCC prison staff during the screening process. He testified that he was placed on a "tier" after the screening examination. Plaintiff said that he subsequently filled out a sick call form and informed the staff nurse multiple times that something was wrong with his eye and that he would like to be seen by a nurse.

Plaintiff stated that on or about August 2, 2017, JPCC staff brought him a cream in a "big, white tube" to soothe his eye, which plaintiff believed to be "something similar to artificial tears." Plaintiff said that he administered the cream to his eye twice that same day, which caused his eye to burn. Plaintiff stated that did not read the directions on the white tube, which stated "not for ophthalmic use, not for use on the eye." He stated that later that night, he informed JPCC Deputy Whitley about his adverse reaction to the cream. Plaintiff stated that Whitley took him off the tier and downstairs to the JPCC medical unit to return the cream to medical staff.

Kimble testified that on or about August 3, 2017, he called his family to tell them about the burning reaction to the cream. Plaintiff said that his family sent JPCC/Correct Health staff an email describing the type of medication plaintiff had received and that JPCC medical staff had given plaintiff the wrong medication for his eye injury. He stated that prison staff subsequently removed him from the tier and brought him downstairs to the medical unit to see Nurse Skye Noble. Nurse Noble asked plaintiff if he still had the cream that caused the adverse reaction, and plaintiff told her that he had given it to medical staff the previous night.

Kimble testified that after he returned the cream and spoke to Nurse Noble, he was not seen by medical staff until August 28, 2017. He stated that between the return of the cream and August 28, 2017, he complained numerous times to deputies and nurses that his eye was "bloodshot red." Plaintiff testified that after he turned in two sick call requests, he was told by prison staff that if he continued to make these requests, his medical appointment date would get pushed back with each request filed. Plaintiff said that he made numerous requests of JPCC deputies for an emergency sick call.

Kimble stated that on the morning of August 28, 2017, he woke up with an "inflamed, swollen, bloodshot-red eye." He stated that his vision in the injured eye was obscured and that he "couldn't even touch it to close it." Plaintiff said that he called his family about his eye condition, and that his family subsequently contacted the prison. Plaintiff stated that he was seen by a physician's assistant, Juanita Alexander-Sallier, on August 28, 2017, at about 1:00 p.m. Plaintiff testified that as soon as Alexander-Sallier saw plaintiff's eye, she advised him that he had developed an eye infection. Kimble stated that Alexander-Sallier gave him antibiotic eye drops, which she told him to administer to his eye for one week, four times a day, every six hours. Plaintiff testified that Alexander-Sallier told him his eye would be soothed almost immediately after administering the eye drops. Kimble said that his eyes became soothed and his eye infection began to disappear after three to four days of use of the eye drops. He testified

that Alexander-Sallier told him that she would see him again for a followup appointment one week after August 28, 2017.

Plaintiff stated that he was not seen by Alexander-Sallier or any medical staff the following week. Plaintiff stated that he discontinued use of the eye drops after one week, in compliance with the instructions Alexander-Sallier gave him on August 28. He testified that on or about September 4, 2017, at 8 or 9 p.m., his eye became inflamed and started burning again. Plaintiff said that he told JPCC prison staff that he wanted to make an emergency sick call to find out what was wrong with his eye. He said that prison staff called the duty nurse, who sent back a note to plaintiff advising him to continue administering his eye drops until he was seen by medical staff.

He testified that his eye infection cleared up on or about September 11, 2017. Plaintiff stated that even though his infection had gone away, his eye continued to bother him. He stated that his eye would still burn throughout the day and while he was sleeping at night. Plaintiff testified that it "felt like someone was poking me in my eye while I was sleeping." In addition to the periodic poking sensation in his eye, plaintiff stated that he experienced blurred vision.

In mid-September 2017, Kimble was briefly transferred to EBRPP. He returned to JPCC on September 27, 2017. Plaintiff had another screening examination upon his reentry to JPCC. Plaintiff stated that after he returned to JPCC, he made some sick call requests about eye irritation and pain. Plaintiff saw Alexander-Sallier on October 23,

2017, who made plaintiff an appointment to see an ophthalmologist at University Medical Center ("UMC") in New Orleans, Lousiana. Kimble said he was taken to UMC on or about November 19, 2017. Plaintiff stated that he was examined and evaluated by an ophthalmologist and two UMC residents. He stated that one of the residents was concerned about the possibility that plaintiff's retina was detaching from his eye. Plaintiff testified that UMC medical staff dilated his eye and observed that there were no signs of retina detachment. Kimble stated that UMC medical staff noted that he had no scratches on his eye and that his eye was in good condition. He said that he told the UMC ophthalmologist about his blurred vision and the burning sensation in his eye. Plaintiff stated that the ophthalmologist concluded that an infection had developed behind plaintiff's eye, a condition that sometimes prevents the eye from producing tears, thus causing dryness. Kimble said the ophthalmologist advised him that the infection had caused permanent damage to plaintiff's eye and that plaintiff would have to administer eye drops to his eye for the remainder of his life.

Plaintiff testified that he returned to JPCC after his UMC appointment. He said that he received eye drops from JPCC medical staff immediately upon his return, and he has regularly been receiving replacement bottles of eye drops since then. Kimble said that he goes through an entire bottle of eye drops every 20 to 27 days. Plaintiff testified that upon request, prison staff at JPCC and EBRPP provide him with replacement bottles of

eye drops whenever one bottle is depleted. Plaintiff stated that he always receives a replacement bottle within 24 hours of his request, at the latest.

## ANALYSIS

### I.  STANDARDS OF REVIEW

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis. 28 U.S.C. § 1915A(a); Thompson v. Hicks, 213 F. App'x 939, 942 (11th Cir. 2007); Lewis v. Estes, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998); Lewis v. Sec'y, DOC, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), aff'd, 589 F. App'x 950 (11th Cir. 2014). Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); Lewis, 589 F. App'x at 952; Thompson, 213 F. App'x at 942; Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended). A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th

Cir. 1994). The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. Spears, 766 F.2d at 180. "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e). Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326–27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable. "The

Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents. A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing." Id. (citing Wilson, 926 F.2d at 482–83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)). However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'" Gobert v. Caldwell, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176–77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." Moore, 976 F.2d at 269. A prisoner's in forma pauperis

10

complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint must be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Plaintiff's complaint, as amended by his testimony at the Spears hearing, fails to state a claim under the broadest reading.[1]

## II. MEDICAL CARE

Kimble was a pretrial detainee during the entire time period about which he complains. Before the Fifth Circuit's decision in Hare v. City of Corinth, 74 F.3d 633 (5th Cir.1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government interest. Bell v. Wolfish, 441 U.S. 520, 539 (1979); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992). The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees." Pfannstiel v. City of Marion, 918 F.2d

---

[1]The court must "liberally construe briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel," Smith v. Lonestar Constr., Inc., 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

In Hare, however, the Fifth Circuit held

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice." Id. at 645. If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission, and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply. Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir. 2009) (citing Bell, 441 U.S. at 539; Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997); Hare, 74 F.3d at 649); Tamez v. Manthey, 589 F.3d 764, 769–70 (5th Cir. 2009) (citing Scott, 114 F.3d at 53; Hare, 74 F.3d at 649).

In Estelle, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under Section 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Estelle, 429 U.S. at 105–06; accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976); Tamez, 589 F.3d at 770; Hare, 74 F.3d at 650. "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). The Farmer definition applies to Eighth Amendment medical claims. Reeves, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. If the court finds that one of the components of the test is not met, it need not address the other component. Davis, 157 F.3d at 1005. "First, the deprivation alleged must be, objectively, 'sufficiently serious;' a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834 (quotation omitted). Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs." Cooper v. Johnson, 353 F. App'x 965, 967 (5th Cir. 2009) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991));

accord Harris v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999); Mendoza v. Lynaugh, 989 F.2d 191, 193 (5th Cir. 1993).

Further, plaintiff must establish that defendant possessed a culpable state of mind. Farmer, 511 U.S. at 838 (citing Wilson, 501 U.S. at 298). A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837; accord Tamez, 589 F.3d at 770 (citing Thompson v. Upshur County, 245 F.3d 447, 458–59 (5th Cir. 2001)). "Such a showing requires the inmate to allege that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" Brewster v. Dretke, 587 F.3d 764, 770 (5th Cir. 2009), cert. denied, 130 S. Ct. 3368 (2010) (quoting Domino v. Texas Dep't of Crim. Justice, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis added).

> The Supreme Court has recently reaffirmed that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . The "deliberate indifference" standard permits courts to separate omissions that amount to an intentional choice from those that are merely unintentionally negligent oversight[s].

Southard v. Texas Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (quoting Board of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997) (other quotations omitted))(emphasis added); accord Tamez, 589 F.3d at 770. "'Subjective recklessness,'"

14

as used in the criminal law, is the appropriate test for deliberate indifference." Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997).

In the instant case, plaintiff's pleadings, as expanded by his testimony, establish that nothing more than episodic acts or omissions as defined in Hare are at issue. See Tamez, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with immediate medical treatment qualifies as an 'episodic act or omission'"). Therefore, the "deliberate indifference" standard applies, and Kimble must allege facts sufficient to establish that defendants knew he faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, plaintiff wholly fails to allege facts sufficient to satisfy the stringent "deliberate indifference" standard.

Initially, it cannot be concluded that the periodic burning, eye dryness and vision problems that plaintiff described presented a serious medical need that posed a substantial risk of harm for purposes of constitutional analysis. Kimble did not suffer "a life-long handicap or permanent loss" of the type required to constitute a serious medical need for constitutional purposes. See Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 overruled in part on other grounds by Hope v. Peltzer, 536 U.S. 730, 739 (2002) (citing Monmouth County v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (medical need is serious when it "results in an inmate's suffering 'a life-long handicap or permanent loss'")). Kimble's testimony and medical records indicate that after examination and dilation of Kimble's eye, his treating ophthalmologist at UMC

determined that there were no signs of retina detachment, no scratches on the eye, and that Kimble's eye was in good condition. His alleged need for eye drops to relieve what he says will now be life-long eye dryness is not a "handicap" or "loss" that could be classified as a serious condition for constitutional purposes. See Swaissi v. Cotten, 2002 WL 492905, at *2 (N.D. Tex. March 28, 2002) (difficulty in reading and need for corrective eyeglasses not a serious medical need); Davidson v. Scully, 155 F. Supp. 2d 77, 88-89 (S.D.N.Y. 2001) (eye infection, eye irritation, tearing, headaches and blurry vision are not serious medical needs); Hayes v. N.Y.S. D.O.C. Officers, 1998 WL 901730, at * 8 (S.D.N.Y. Dec. 28, 1998) (complaints of eye pain, tearing and impaired vision one week following eye injury failed to state serious medical need); compare Koehl v. Dalsheim, 85 F.3d 86, 87 (2d Cir. 1996) (plaintiff who required eyeglasses to correct severe double vision and loss of depth perception; who walked into walls and objects, causing him to fall and suffer additional injuries; and who suffered serious, permanent eye damage as a result of deprivation of glasses had serious medical need). Even much more serious eye conditions than those described by Kimble, such as eye cataracts not requiring surgery, have been held not to constitute serious medical need for purposes of constitutional analysis. Samonte v. Bauman, 264 Fed. Appx. 634, 2008 WL 176462, at *1 (9th Cir. 2008); Dunville v. Morton, 234 F.3d 1272, 2000 WL 1206653, at *1 (7th Cir. 2000); Hurt v. Mahon, No. 1:09CV958, 2009 WL 2877001, at *2 (E.D. Va. Aug. 31, 2009).

Even assuming, however, that plaintiff's eye condition presented serious medical needs for constitutional purposes, Kimble has alleged facts, confirmed by his testimony and the medical records, that negate any inference of deliberate indifference by jail officials. His complaint, as amended by his testimony and confirmed by the medical records, shows that he received constitutionally adequate medical care while incarcerated in JPCC and EBRPP. Kimble testified that he was examined and treated by a physician's assistant and nurses at both jails, and that he received medication for his infection, pain, redness, dryness and irritation in his eye. The verified medical records confirm that he was seen for treatment and examination of his eye at least five (5) times during his JPCC and EBRPP incarceration, including an off-site appointment with an ophthalmologist at UMC. Record Doc. No. 34. Plaintiff testified that as soon as he suffered an adverse reaction to the improper medication given to him by JPCC medical staff, a JPCC deputy promptly took plaintiff to the medical unit to return the medication. Plaintiff testified that upon his initial diagnosis of an eye infection by a physician's assistant at JPCC, he was immediately given the antibiotic eye drops necessary to treat his optical symptoms. The medical records also indicate that plaintiff received naproxen to treat his pain symptoms. Id. Plaintiff testified that he received proper medical instructions on how often to administer the eye drops and that medical staff at JPCC immediately instructed him to continue use of the eye drops after plaintiff's brief lapse in using the medication resulted in inflamation and burning of his eye.

Plaintiff testified that his eyes became soothed and his eye infection began to disappear after three to four days of administering the eye drops and his eye infection completely disappeared within two weeks. Moreover, plaintiff testified that JPCC and EBRPP prison staff continue to provide him with these eye drops on a regular basis and without delay to treat his lingering symptoms of eye dryness and blurry vision. Plaintiff stated that staff at the two prisons promptly provide him with replacement bottles of eye drops whenever one bottle is depleted. Plaintiff stated that a fresh bottle is given to him within 24 hours of his request, at the latest.

Contentions like Kimble's that amount to a mere disagreement with the speed, quality, or extent of medical treatment, or even malpractice or negligence such as providing the wrong kind of ointment for his eye condition, do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); accord Rowe v. Norris, 198 Fed. Appx. 579, 2006 WL 2711945, at *2 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Walton v. Sec'y Veterans Admin., 187 F. Supp. 3d 1317, 1329 (N.D. Ala. 2016) (quoting Bass v. Sullivan, 550 F.2d 229, 232 (5th Cir. 1977) ("[A] 'malpractice [claim] will not

18

lie under [Section] 1983' because it is a claim arising under state common law – not a constitutional violation."); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Williams v. Browning, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

Kimble's complaints in this case about his medical care at most present a state law negligence claim. He fails to state a claim of violation of his constitutional rights sufficient to obtain relief under Section 1983 because he cannot establish deliberate indifference under the applicable constitutional standard. Thus, plaintiff's complaints about his medical care advance a legally frivolous argument and fail to state a claim for relief based upon violation of his constitutional rights under Section 1983.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's sole remaining medical care claim be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

**IT IS FURTHER RECOMMENDED** that final judgment be entered in favor of the remaining defendants and against plaintiff as to his complaint as a whole, based upon the opinion issued by the district judge from the Middle District, Record Doc. No. 15, and this report and recommendation.

A party's failure to file written objections to the proposed findings, conclusions and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

New Orleans, Louisiana, this  11th  day of January, 2019.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.